IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2025

IN RE HUNTER W.[1] ET AL.

**Appeal from the Juvenile Court for Shelby County**
**No. GG2465      W. Ray Glasgow, Magistrate**

_____

**No. W2025-00718-COA-R3-PT**

_____

A mother appeals the termination of her parental rights for abandonment by failure to visit, abandonment by failure to support, persistence of conditions, and failure to manifest an ability and willingness to assume custody of her children. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Ada Johnson, Memphis, Tennessee, for the appellant, Gabrielle W.

Jonathan Skrmetti, Attorney General and Reporter, and Allen T. Martin, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND**

Gabrielle W. ("Mother") is mother to Hunter W., born July 2015; Serenity S., born January 2018; and Gracie W., born May 2020 (together, "the Children"). No father was listed on Hunter's and Gracie's birth certificates. Daniel S. is Serenity's father.[2] Mother identified Jeremy B. as the father of Hunter and Gracie. In November 2023, Jeremy B.

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

[2] The trial court terminated Daniel S.'s parental rights to Serenity, and Daniel S. did not appeal. This appeal concerns only Mother's parental rights to the Children.

signed a waiver of interest and notice regarding his potential parental rights to Hunter and Gracie.

In 2016, the Department of Children's Services ("DCS") became aware of allegations that Mother nutritionally neglected Hunter. DCS filed a dependency and neglect petition. In November 2017, the Shelby County Juvenile Court ("the trial court") entered an order finding Hunter dependent and neglected. Hunter was placed in DCS custody. In July 2018, after Mother cooperated with DCS, Hunter was restored to Mother's custody.

In December 2020, Mother took five-year-old Hunter to the hospital after he received a laceration on his chin. The incident was referred to DCS. Leading up to this incident, Mother and the Children were living with Mother's sister and mother. Hunter told emergency room staff that Mother's sister pushed him off a bed because he drank out of her drink. When asked by the medical staff about Hunter's low weight, Mother became upset and expressed a fear that Hunter would be removed from her custody again. The medical staff uncovered more medical issues with Hunter, including bruising, lower back fractures, a distended abdomen, and elevated liver enzymes. As a result of treatment, Hunter began to gain some weight, and Mother was instructed on how best to provide for Hunter's nutritional needs. Nevertheless, at a follow-up appointment a few weeks later, Hunter's weight remained the same.

In January 2021, two-year-old Serenity was seen at the hospital. According to Serenity's medical records, she had not been to a doctor in about a year. When she was last seen before this hospital visit, the doctor noted her small size and concerns of medical neglect. Serenity presented at the hospital with a soiled diaper and diaper rash. She could barely say more than three words and had "profound abdominal distension and relative wasting of her upper and lower extremities." Gracie was examined at the hospital, as well. In July 2020, six-week-old Gracie was admitted to the hospital for failure to thrive and poor weight gain. She was able to gain weight while in the hospital and was released into Mother's care. At the January 2021 medical examination, eight-month-old Gracie still showed poor weight gain.

In the wake of these revelations about the Children's health, DCS intervened with the family once again. On February 1, 2021, the Children entered DCS custody, and they remain in foster care. The trial court found that the Children were dependent and neglected and that Hunter had been severely abused. These findings were affirmed by the Shelby County Circuit Court, and Mother appealed to this Court. On October 7, 2025, this Court affirmed the severe abuse finding as to Hunter, *In re Hunter W.*, No. W2024-00479-COA-R3-JV, 2025 WL 2838238 (Tenn. Ct. App. Oct. 7, 2025), *no perm. app. filed*, and the dependency and neglect findings as to Serenity and Gracie, *In re Gracie W.*, No. W2024-00478-COA-R3-JV, 2025 WL 2838539 (Tenn. Ct. App. Oct. 7, 2025), *no perm. app. filed*.

On April 14, 2022, by order of the trial court, DCS was relieved of making reasonable efforts to reunite Hunter with Mother. On February 7, 2024, by order of the Shelby County Circuit Court, DCS was relieved of making reasonable efforts to reunite Serenity and Gracie with Mother. On March 28, 2024, DCS filed a petition in the trial court seeking to terminate Mother's parental rights as to the Children and Daniel S.'s parental rights as to Serenity. Mother filed an answer in opposition. In April 2025, the petition was tried.

Mother testified first. Mother was asked about Hunter's injuries and conditions, and Mother claimed she did not know how Hunter had broken his back. As for the laceration on his chin, Hunter told Mother that her sister had thrown him out of bed. Mother stated that Hunter incurred bruising on his legs and arms from her sister "whopping" him. Mother said that although Hunter looked underweight before she took him to the hospital, she did not take him to the doctor because she had transportation issues. When asked if she knew TennCare could have assisted with transportation, Mother said that she could not schedule the transportation 24 to 48 hours in advance as required for the service.

Mother testified that after DCS urged her to find a new residence for the Children, she moved to a hotel, along with her boyfriend. After a month or two, the Children entered DCS custody, and Mother and her boyfriend then moved into the home of Mother's mother. Mother testified that after a few months, she and her boyfriend got an apartment but that she later left because the apartment was too small for the Children. Mother said she moved in with her boyfriend's parents and that after a year and a half, Mother moved into a hotel room with her mother.

Mother testified that about a month before trial, she started working at Cracker Barrel as a server, earning about $2.13 per hour plus tips. Mother had earned about $300 since she began working for Cracker Barrel. She stated her plan was to move into an apartment big enough for her and the Children, although the deposit for the place she had in mind was $150, and the rent was $800 per month. When asked how she could afford this given that she had only earned $300 in one month of working at Cracker Barrel, Mother simply said that she would try to get the money.

By the time of trial, Mother had not seen the Children since 2023. Mother attributed the lack of visits to her finances. Regarding child support, Mother said that she gave the Children some Valentine's Day baskets in 2023. She also gave them "clothes and stuff." When asked why the Children had been malnourished in her care, Mother said: "Because they were losing weight and gaining weight off and on. The weight was coming off." Mother said that the Children had been properly fed. She acknowledged that since the Children have been in foster care, they have not been malnourished. Mother had not been to any of Hunter's or Serenity's medical appointments. She acknowledged that she was not currently in a place to safely parent the Children.

- 3 -

Mother had various jobs during the custodial period, none of which lasted longer than six months. Mother worked at Goodwill for six months beginning on March 12, 2024. She also worked at Mid-South Senior Group as a medical assistant for four to five months beginning in April 2024. Mother left her Goodwill job because they moved the location of her employment, and she left her Mid-South Senior Group job because of transportation issues. Mother resumed working at Cracker Barrel about a month before trial.

With respect to her mental status, Mother testified that she has been diagnosed with anxiety, depression, and post-traumatic stress disorder. In November 2024, Mother sought help from a psychiatrist, and she said she informed DCS of this development in January or February of 2025. Previously, Mother had sought help through the Alliance group but was discharged for noncompliance. By the time of trial, Mother had completed a parenting assessment and parenting classes. Once DCS was relieved of reasonable efforts, Mother contacted Camelot for help with visiting the Children. Camelot said that they needed a referral from DCS, which Mother never obtained. Mother looked into using another agency, but that agency charged a $365 service fee and $50 an hour for visits. Mother said that she had no timeframe for when she would be ready to regain custody of the Children because she still needed stable housing.

Shurvette Mosley ("Mosley"), a DCS family service worker who worked on the Children's case, testified next. Mosley said that in February of 2021, Mother signed the criteria and procedures for termination of parental rights. When the termination petition was filed on March 28, 2024, Hunter was eight years old, Serenity was six, and Gracie was three. According to Mosley, Mother had neither visited the Children nor given them any child support in the four months before the petition was filed. Mother had not visited the Children at all since August 2023. When asked what issues prevented the Children from returning to Mother's custody, Mosley answered: "The mother's overall instability with housing, concerns with stable employment, just understanding the general needs of her children medically so that they'll be able to continue to thrive." Both Hunter and Serenity have neurodevelopmental and neurobehavioral disorders, and Mother did not attend specialist appointments for the Children. As for Mother's relationship with the Children, they referred to Mother by her first name. The Children call their foster parents "mom and dad." Mosley said that the Children are thriving with and bonded to their foster family.

Last to testify was Elizabeth W. ("Foster Mother"). When the Children entered Foster Mother's home, they were "extremely small and extremely dirty." Serenity's hair had not been groomed. Hunter's toenails curled beneath his feet. Foster Mother testified that the Children have been to many medical appointments in her care. Since entering her care, the Children have consistently gained weight. Hunter previously underwent speech and physical therapy and was now undergoing occupational therapy. He was a year or two behind in most subjects. Serenity, too, underwent occupational therapy. Gracie initially required therapy but later progressed out. Gracie was age appropriate in terms of her

development.  Serenity, however, is delayed intellectually and academically and, at seven years old, still uses Pull-Ups.

Foster Mother documented 13 to 15 visits by Mother with the Children, with the last in-person visit taking place in August 2023.  Mother had twice asked Foster Mother about a school supply list.  Otherwise, Mother did not reach out to Foster Mother.  The previous school year, Mother provided some crayons, pencils, and other items.  Foster Mother also recounted how in 2024, Mother gave the Children some Valentine's Day gifts.

On June 10, 2025, the trial court entered its final judgment terminating Mother's parental rights to the Children.  The trial court found by clear and convincing evidence that DCS had proven the grounds of abandonment by failure to visit, abandonment by failure to support, persistence of conditions, and failure to manifest an ability and willingness to assume custody of the Children.  The trial court found further, also by clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interests. Mother timely appealed.

## ISSUES

Mother challenges each of the grounds found against her as well as the trial court's best interests determination.  Mother raises four issues, which we restate slightly:

1. Whether the trial court erred in finding the grounds of abandonment by failure to visit and failure to support.

2. Whether the trial court erred in finding the ground of persistence of conditions.

3. Whether the trial court erred in finding the ground of failure to manifest an ability and willingness to assume custody.

4. Whether the trial court erred in finding that the termination of Mother's parental rights is in the Children's best interests.

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)).  "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023).  This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction

- 5 -

regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d 507, 522 (Tenn. 2016) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court has explained, we employ a two-step process in reviewing termination cases:

> To review trial court decisions, appellate courts use a [ ] two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

DISCUSSION

*Grounds for termination*

    *1.    Abandonment*

The trial court found that Mother abandoned the Children through failure to visit and failure to support. Abandonment is grounds for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1).[3] Abandonment occurs, among other circumstances, when:

(i)(*a*) If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(*b*) If the child is less than four (4) years of age, for a period of three (3) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or amended or supplemental petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(i). It is an affirmative defense to abandonment for both failure to visit and failure to support that the parent's failure is not willful. *Id.* § 36-1-102(1)(I).

DCS filed its termination petition on March 28, 2024. Therefore, the relevant timeframe for our abandonment analysis is November 28, 2023 through March 27, 2024, for Hunter and Serenity and December 28, 2023 through March 27, 2024 for Gracie.[4] *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App.

---

[3] In termination cases, we apply the version of the statute in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017). The termination petition in this case was filed on March 28, 2024.

[4] When the termination petition was filed, Hunter was eight years old, Serenity was six, and Gracie was three. Thus, the four-month period applies to Hunter and Serenity, and the three-month period applies to Gracie.

Feb. 20, 2014), *no perm. app. filed* ("[T]he applicable four month window for determining whether child support has been paid in the context of . . . failure to support includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed."). With respect to the abandonment grounds of failure to visit and failure to support, the trial court found as follows:

42. Pursuant to T.C.A. § 36-1-113(g)(1) and as defined by T.C.A. § 36-1-102(1)(A)(i), [Mother] has abandoned Gracie in that, for a period of three (3) consecutive months immediately preceding the filing of the Petition, she failed to visit Gracie and failed to make any contribution whatsoever toward the support of the child. Ms. Mosley testified that Gracie was three at the time this Petition was filed. The Department filed the Petition on March 28, 2024, and [Mother] failed to visit or support Gracie from December 28, 2023, through March 27, 2024. Ms. Mosley testified that prior to the filing of this Petition that [Mother] had not visited Gracie nor contributed to the support of the child since a visit on August 23, 2023. The Court finds that [Mother] herself testified the items she provided in March 2024 were "small" and the Court finds those gifts to be token and not to count as substantive support necessary for the care of Gracie.

43. [Mother] did not allege the affirmative defense that her abandonment of the child was not willful, and the Court did not consider this affirmative defense as a means of defeating this abandonment finding.

44. Pursuant to T.C.A. § 36-1-113(g)(1) and as defined by T.C.A. § 36-1-102(1)(A)(i), [Mother] has abandoned Hunter and Serenity in that, for a period of four (4) consecutive months immediately preceding the filing of the Petition, she failed to visit Hunter and Serenity and failed to make any contribution whatsoever toward the support of Hunter and Serenity. Ms. Mosley testified that Hunter was eight and Serenity was six at the time of the filing of this Petition. The Department filed the Petition on March 28, 2024, and [Mother] failed to visit or support Hunter and Serenity from November 28, 2023, through March 27, 2024. Ms. Mosley testified that prior to the filing of this Petition that [Mother] had not visited Hunter and Serenity nor contributed to the support of the two children since a visit on August 23, 2023. The Court finds that [Mother] herself testified the items she provided in March 2024 were "small" and the Court finds those gifts to be token and not to count as substantive support necessary for the care of Hunter and Serenity.

45. [Mother] did not allege the affirmative defense that her abandonment of Hunter and Serenity was not willful, and the Court did not consider this affirmative defense as a means of defeating this abandonment finding.

*Abandonment by failure to visit*

When DCS filed its termination petition on March 28, 2024, Mother had not visited the Children since August 2023. Applying both the four-month determinative period for Hunter and Serenity and the three-month determinative period for Gracie, Mother failed to visit any of the Children during the relevant timeframes. Mother argues on appeal that her failure to visit was not willful, and she attributes her failure to DCS having been relieved of reasonable efforts to help her. According to Mother, this "made it difficult" for her to visit.

Lack of willfulness is an affirmative defense. Mother failed to timely raise lack of willfulness as an affirmative defense below and did not include it in her answer. She cannot rely on the defense now. Further, Mother's perfunctory statement that DCS's lack of assistance "made it difficult" for her to visit does not account for her wholesale failure to visit the Children during the determinative periods. The evidence does not preponderate against the trial court's findings relative to this ground. The evidence is clear and convincing that in the three- and four-month periods before the termination petition was filed, Mother did not visit any of the Children. We agree with the trial court that the ground of abandonment by failure to visit was proven by clear and convincing evidence.

*Abandonment by failure to support*

Mother has never paid any child support for the Children. At all relevant times in this matter, Mother has been of majority age and presumed to be aware of her duty to support. *See* Tenn. Code Ann. § 36-1-102(1)(H) ("Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children[.]"). Failure to support includes failure to provide more than token payments. *See* Tenn. Code Ann. § 36-1-102(1)(D). Token support means that the "support, under the circumstances of the individual case, is insignificant given the parent's means[.]" Tenn. Code Ann. § 36-1-102(1)(B).

It is undisputed that Mother did not pay any child support. Foster Mother testified that Mother did give the Children some Valentine's Day gifts in 2024, thus falling within the determinative periods. Mother's own testimony was that she gave the Children Valentine's Day baskets in 2023, outside of the determinative periods. DCS contends that even if Mother provided these items during the determinative periods, they were only token. We agree with DCS. Mere knick-knacks for Valentine's Day do not constitute genuine child support in any sense. The evidence does not preponderate against the trial court's findings relative to this ground. The evidence is clear and convincing that, in the three- and four-month periods before the termination petition was filed, Mother did not provide more than token support for any of the Children. We conclude that the ground of abandonment by failure to support was proven against Mother by clear and convincing evidence.

*2. Persistence of conditions*

Next, the trial court terminated Mother's parental rights pursuant to Tennessee Code Annotated section 36-1-113(g)(3). Section (g)(3)(A) provides that termination may occur when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

Tenn. Code Ann. § 36-1-113(g)(3).

This Court has explained that:

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008) (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *7 (Tenn. Ct. App. July 13, 2000)). The failure to remedy the conditions which led to the removal need not be willful. *In re T.S. & M.S.*, 2000 WL 964775, at *6 (citing *State Dep't of Human Servs. v. Smith*, 785 S.W.2d 336, 338 (Tenn. 1990)). "Where . . . efforts to provide help to improve the parenting ability, offered over a long period of time, have proved ineffective, the conclusion is that there is little likelihood of such improvement as would

- 10 -

allow the safe return of the child to the parent in the near future is justified." *Id*. The purpose behind the "persistence of conditions" ground for terminating parental rights is "to prevent the child's lingering in the uncertain status of foster child if a parent cannot within a reasonable time demonstrate an ability to provide a safe and caring environment for the child." *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at \*20 (Tenn. Ct. App. Oct. 13, 2008) (quoting *In re D.C.C.*, No. M2007-01094-COA-R3-PT, 2008 WL 588535, at \*9 (Tenn. Ct. App. Mar. 3, 2008)).

*In re Nevada N.*, 498 S.W.3d 579, 605–06 (Tenn. Ct. App. 2016). In addition,

> this ground for termination may be met when either the conditions that led to the removal persist or "other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian[.]" [Tenn. Code Ann. §] 36-1-113(g)(3)(A)(i). Thus, even if the initial reasons that the children were placed in DCS custody have been remedied, if other conditions continue to persist that make the home unsafe, this ground may still be shown.

*In re Daylan D.*, No. M2020-01647-COA-R3-PT, 2021 WL 5183087, at \*9 (Tenn. Ct. App. Nov. 9, 2021).

With respect to this ground, the trial court found:

> 46. Pursuant to T.C.A. § 36-1-113(g)(3), Hunter, Serenity, and Gracie have been in the custody of the Department for more than six (6) months preceding the filing of this Petition, and the conditions which led to removal from the home or physical or legal custody of the parent still persist and other conditions exist which in all probability would cause the children to be subjected to further abuse and neglect and which, therefore, prevent the children's safe return to the care of [Mother]. Further, there is little likelihood that these conditions will be remedied at an early date so that the children can be safely returned to [Mother] in the near future; the continuation of the legal parent and children relationship greatly diminishes the children's chances of early integration into a safe, stable and permanent home; and continuation of the legal parent and children relationship is not in said children's best interest. [Mother] has not made such a lasting adjustment as to enable the children to be returned to her safely. Testimony was that the three children entered foster care in February of 2021 due to concerns of unexplained physical injuries on Hunter, and malnutrition or at least poor nutrition in all three children. By the time of trial, the children had remained in foster care for four years and two months. Ms. Mosley testified that her

major concerns at the time of the trial regarding [Mother] were [Mother's] ongoing housing instability and her difficulty comprehending things regarding the children and their needs. Ms. Mosley testified that for much of the case [Mother] has been without stable housing. [Mother] testified that she wants her children back, but [Mother] did not seem to have a real plan for how and when that would be possible. Testimony was that [Mother] was residing in a motel at the time of trial and that her mother was covering the costs. [Mother] presented a plan where she was going to put a deposit on an apartment within the next month, but her explanation for how she was going to be able to afford it did not match up with her other testimony about her income. Testimony showed that these three children have minimal bonds with [Mother] at this point and that they consider their family to be their foster parents. Further, the foster parents are the ones aware of and actively working to help these children overcome their physical, educational, social, gross-motor, and fine-motor delays by implementing appropriate and regular services for the children.

It is undisputed that the Children were removed from Mother's custody for at least six months and that the Children were alleged to be dependent and neglected. The Children were initially removed from Mother's care due to being malnourished and medically neglected. The Children's health has improved over the course of their time with their foster family. Although the Children are no longer malnourished, other conditions exist which would likely cause the Children to be subjected to further neglect should they be returned to Mother's custody. There is no hint in the record that Mother has learned from the Children's past harmful experiences in her care or is prepared to address the Children's specific needs today. In addition, Mother has only ever offered token and occasional in-kind support over the years. Mother also has ongoing issues with stable housing and, by her own candid admission at trial, cannot safely parent the Children at present.

After four years of the custodial episode, there is little likelihood that these conditions will be remedied in the near future. In the meantime, the Children are thriving with their foster family. Under these circumstances, continuing the parent-child relationship greatly diminishes the Children's chances of early integration into a safe, stable, and permanent home. The evidence does not preponderate against the trial court's findings relative to this ground. We conclude that the ground of persistence of conditions was proven against Mother by clear and convincing evidence.

### 3. *Failure to manifest an ability and willingness*

The final statutory ground for termination found by the trial court was failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Children. This ground applies when

[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires clear and convincing proof of two elements. *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). The petitioner must first prove that the parent has failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. *Id.* The petitioner must then prove that placing the child in the custody of the parent poses "a risk of substantial harm to the physical or psychological welfare of the child." *Id.* The statute requires "a parent . . . to manifest both an ability and willingness" to personally assume legal and physical custody or financial responsibility for the child. *Id.* at 677. Therefore, if a party seeking termination of parental rights establishes that a parent or guardian "failed to manifest *either* ability or willingness, then the first prong of the statute is satisfied." *Id.*

Regarding the second statutory prong,

[t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

The trial court found as follows concerning this ground:

47. Pursuant to T.C.A. § 36-1-113(g)(14), [Mother] has failed to manifest, by act or omission, an ability and willingness to assume legal and physical custody or financial responsibility of the minor children; and placing the children in the legal or physical custody of [Mother] would pose a risk of substantial harm to the physical or psychological welfare of the children. Ms. Mosley testified that [Mother] has repeatedly indicated via her words that she wishes to regain custody of her children, but her actions have not matched up with those words. Testimony showed that [Mother] has been without stable housing for four years and still does not have housing that she controls at the time of trial. Further, [Mother] appears to have significant mental

- 13 -

health issues, but there was no clear proof she has been doing what is necessary to care for her mental health. [Mother] admits she was discharged from mental health services for noncompliance in 2023 and that she did not notify the Department [that] she began seeking new mental health treatment until right before trial. At trial, [Mother] testified that all of her diagnoses had changed from her prior diagnoses, but had no records to this effect, and she conceded she had not provided the Department the necessary release to get her records themselves. [Mother] has no true ability to financially support the children at the time of trial and she has no stable transportation plan to get them to their various appointments. These children have thrived in the care of [the foster parents] for the past four years and all of their needs are being met by [the foster parents]. The children have only seen their mother two times since June of 2022 and they do not really know her anymore. The testimony showed there is no real remaining bond outside of biological ties. Removing these children from the home where they are thriving and placing them with a virtual stranger who is struggling to care for herself would devastate the children emotionally and potentially physically. All of the children entered foster care malnourished and [Mother] has no real explanation for that to this day.

The record does not preponderate against the trial court's factual findings as to this ground. Mother has expressed a desire to regain custody of the Children. However, as found by the trial court, "her actions have not matched up with those words." Mother has not shown an interest in learning about or attending to the Children's specific medical needs. Mother visited the Children a mere 15 times in four years and has not visited them at all since August 2023. Mother's employment and housing situations have remained in flux over the years. These actions and inactions do not reflect a willingness on Mother's part to assume custody of the Children. When examining willingness under section 36-1-113(g)(14), "'we look for more than mere words' and may consider whether a parent has attempted 'to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.'" *In re Jaxx M.*, No. E2018-01041-COA-R3-PT, 2019 WL 1753054, at *9 (Tenn. Ct. App. Apr. 17, 2019) (quoting *In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019)). Mother's deeds have not matched her stated willingness.

Even if Mother were willing to assume custody of the Children, Mother is unable to do so. By her own admission, Mother cannot safely parent the Children at the present time and has offered no timeframe for when she will be able to. This comes after a custodial period of over four years. Despite this passage of time, Mother still shows little understanding of the Children's medical needs. Mother lacks suitable housing and has an on-again, off-again employment history. Based on this record, Mother lacks the ability to assume custody of the Children. By clear and convincing evidence, the first prong of this ground is satisfied.

- 14 -

As to the second statutory prong of section (g)(14), the trial court found that "[r]emoving these children from the home where they are thriving and placing them with a virtual stranger who is struggling to care for herself would devastate the children emotionally and potentially physically." The record supports this finding. The Children have, with the help of their foster family, made significant progress from the condition they were in while in Mother's custody. The Children have since bonded with their foster family. Removing the Children from a home in which they have received the necessary medical care, and in which they are strongly bonded, poses a risk of substantial harm to the physical or psychological welfare of the Children. Both prongs of this ground have been proven by clear and convincing evidence. We conclude that the ground of failure to manifest an ability and willingness to assume custody has been proven by clear and convincing evidence.

### 4. Best Interests

In addition to proving at least one statutory ground for termination, DCS must prove by clear and convincing evidence that the Children's best interests are served by terminating Mother's parental rights. Tenn. Code Ann. § 36-1-113(c). Indeed, "a finding of unfitness does not necessarily require that the parent's rights be terminated." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005) (citing *White v. Moody*, 171 S.W.3d 187, 193 (Tenn. Ct. App. 2004)). Our termination statutes recognize that "[n]ot all parental misconduct is irredeemable" and that "terminating an unfit parent's parental rights is not always in the child's best interests." *Id*. As such, the focus of the best interests analysis is not the parent but rather the child. *Id*.; *see also White*, 171 S.W.3d at 194 ("[A] child's best interests must be viewed from the child's, rather than the parent's, perspective.").

When determining whether termination is in a child's best interests, we refer to twenty non-exclusive factors found at Tennessee Code Annotated § 36-1-113(i)(1). The trial court correctly applied the relevant factors, reasoning as follows:[5]

> a. Pursuant to T.C.A. § 36-1-113(i)(1)(A), a termination of parental rights will meet the children's critical need for stability and continuity of placement throughout their minority. The children have been in a pre-adoptive foster home since they entered foster care in February of 2021. The children call [the foster parents] "mama and daddy" and are thriving in their care. This factor favors termination of [Mother's] parental rights.
>
> b. Pursuant to T.C.A. § 36-1-113(i)(1)(B), a change of caretakers and physical environment is likely to have a negative effect on the children's

---

[5] The trial court made concurrent best interests findings regarding Daniel S., Serenity's father, alongside Mother. However, since this Opinion concerns only Mother's parental rights, we set out the trial court's best interests analysis only as it relates to Mother.

emotional, psychological, and medical condition. These children entered foster care in poor physical conditions with poor health. Testimony was that Serenity and Hunter have required multiple therapies to help get them to the same level as their peers. [The foster parents] have been the ones advocating for these children and ensuring these services occur. The children consider [the foster parents] to be their parents. Removing them from their only known parents and placing them with [Mother] . . . would be detrimental to the children. This factor favors termination of [Mother's] parental rights.

c. Pursuant to T.C.A. § 36-1-113(i)(1)(C), [Mother has] not demonstrated continuity and stability in meeting the children's basic material, educational, housing, and safety needs . . . [Mother] appears to have tried to gain stability so she can care for her children, but her testimony shows that she is still not in a position to provide her children with any kind of stability. This factor favors termination of [Mother's] parental rights.

d. Pursuant to T.C.A. § 36-1-113(i)(1)(D), [Mother] and the children do not have a secure and healthy parental attachment, and there is not a reasonable expectation that [Mother] can create such attachment. The testimony was that [Mother] has only visited one time since 2023. . . . The testimony was that the children have never asked about their parents one time since entering foster care. In fact, Ms. Mosley testified that Hunter and Serenity call [Mother] "Gabrielle" at the few visits that have occurred. There is no parental attachment between these children and [Mother]. This factor favors termination of [Mother's] parental rights.

e. Pursuant to T.C.A. § 36-1-113(i)(1)(E), [Mother has] not maintained regular visitation or other contact with the children and did not use the visitation or other contact to cultivate a positive relationship with the children. Testimony was that . . . [Mother] has visited "ten to thirteen" times in four years with the majority of those visits being in the first year. The Court cannot call that regular visitation. This factor favors termination of [Mother's] parental rights.

f. Pursuant to T.C.A. § 36-1-113(i)(1)(F), there was no testimony that the children are fearful of living in the home of [Mother]. This factor does not apply and is not considered.

g. Pursuant to T.C.A. § 36-1-113(i)(1)(G), the parents, parents' home, or others in the parent's household trigger or exacerbate the children's experience of trauma or post-traumatic symptoms. Based on testimony of the children when they entered foster care and their bond with their [foster]mother, the children would suffer from trauma or trauma symptoms

- 16 -

if returned to [Mother's] care. This factor favors termination of [Mother's] parental rights. . . .

h. Pursuant to T.C.A. § 36-1-113(i)(1)(H), the children have created a healthy parental attachment with another person or persons in the absence of [Mother]. The testimony clearly showed that these three children have two caring, attentive parents with whom they are well-bonded, but that those parents are the foster parents. . . . This factor favors termination of [Mother's] parental rights.

i. Pursuant to T.C.A. § 36-1-113(i)(1)(I) the children have emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings. Testimony was that the children are well-integrated into the extended family of the foster parents. This factor favors termination of [Mother's] parental rights.

j. Pursuant to T.C.A. § 36-1-113(i)(1)(J), [Mother has] not demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the children to be in their homes. Testimony was that . . . [Mother] has tried to change her circumstances, but has largely not succeeded in doing so. This factor favors termination of [Mother's] parental rights.

k. Pursuant to T.C.A. § 36-1-113(i)(1)(K), [Mother has] not taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions. Testimony shows that [Mother] has [not] made a lasting adjustment of circumstances based on services or programs offered by the community or the Department. This factor favors termination of [Mother's] parental rights.

1. Pursuant to T.C.A. § 36-1-113(i)(1)(L), the children are in the custody of the Department. . . . Testimony was that the Department is relieved of making reasonable efforts as to [Mother], so this factor weighs neither for nor against termination of her parental rights.

m. Pursuant to T.C.A. § 36-1-113(i)(1)(M), [Mother has] not demonstrated a sense of urgency in seeking custody of the children or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the children's best interest. Testimony was that [Mother] has [not] shown any true initiative in regaining custody of these children. This factor favors termination of [Mother's] parental rights.

n. Pursuant to T.C.A. § 36-1-113(i)(1)(N), [Mother] has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the

children or any other children or adult. The testimony of the children's physical condition from neglect when they entered foster care was striking. This factor favors termination of parental rights of [Mother]. . . .

o. Pursuant to T.C.A. § 36-1-113(i)(1)(O), [Mother has] not ever provided safe and stable care for the children or any other children. Testimony was that this was Hunter's second foster care episode relating to [Mother's] inability to properly care for him. Gracie and Serenity were also very neglected at the time they entered foster care. This factor favors termination of [Mother's] parental rights.

p. Pursuant to T.C.A. § 36-1-113(i)(1)(P), [Mother has] not demonstrated an understanding of the basic and specific needs required for the children to thrive. Testimony shows that [Mother] has [not] kept in contact enough to understand the children's basic and specific needs. This factor favors termination of [Mother's] parental rights.

q. Pursuant to T.C.A. § 36-1-113(i)(1)(Q), [Mother has] not demonstrated the ability and commitment to creating and maintaining a home that meets the children's basic and specific needs and in which the children can thrive. Testimony shows that [Mother] has [not] kept in contact enough to understand the children's basic and specific needs. This factor favors termination of [Mother's] parental rights.

r. Pursuant to T.C.A. § 36-1-113(i)(1)(R), the physical environment of [Mother's home is] unhealthy and not safe for the children. . . . Testimony was that [Mother] lives in a motel that someone else pays for and resides in with her. This factor favors termination of [Mother's] parental rights

s. Pursuant to T.C.A. § 36-1-113(i)(1)(S), [Mother has] not consistently provided more than token financial support for the children. Testimony was that . . . [Mother] has provided minimal support for the children over four years with no consistency. This factor favors termination of [Mother's] parental rights.

t. Pursuant to T.C.A. § 36-1-113(i)(1)(T), the mental or emotional fitness of [Mother] would be detrimental to the children or prevent [Mother] from consistently and effectively providing safe and stable care and supervision of the children. Testimony shows that [Mother] has mental health issues that affect her functioning, and which do not seem to be under appropriate treatment. . . . This factor favors termination of [Mother's] parental rights.

Mother argues that "a number of the factors weighed" for her. However, she does not identify the factors. The trial court found that, out of 18 applicable factors, all weighed in favor of termination. The evidence does not preponderate against the trial court's factual findings. Mother contends further that DCS "did not present any evidence to show that [Mother] posed a risk" to the Children. We disagree. Mother testified that she cannot safely parent the Children, and she offered no timeframe for when she will be able to. This stark admission came some four years after the custodial episode began. The Children have waited in legal limbo long enough.

The Children entered DCS custody with myriad health issues. The contrast between the Children's health at the beginning of the custodial episode and their health now is substantial. The Children are no longer malnourished or neglected. While Hunter and Serenity are still addressing their developmental issues through therapy, their health has nevertheless improved substantially since joining their foster family. Gracie progressed out of therapy and is developmentally age appropriate.

There is simply no hint in this record that Mother can address the Children's needs. Mother lacks suitable housing and the resources to care for the Children. Mother has ongoing mental health issues, and she has never demonstrated an adequate understanding of how the Children came to be neglected in the first place, much less how to avoid similar crises going forward. Significantly, the Children have practically no relationship with Mother. By contrast, the Children are firmly bonded with their foster family. Given Mother's admitted inability to safely parent the Children, it is not in the Children's best interests to return them to Mother's custody. We conclude that termination of Mother's parental rights is unquestionably in the Children's best interests.

## CONCLUSION

The judgment of the Juvenile Court for Shelby County is hereby affirmed. Costs on appeal are assessed to the appellant, Gabrielle W., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE